Rosemary M. Rivas (SBN 209147)
Email: rrivas@finkelsteinthompson.com
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES MORAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VCA, INC., ROBERT L. ANTIN, JOHN M. BAUMER, JOHN B. CHICKERING JR., JOHN HEIL, AND FRANK REDDICK,<br><br>Defendants. | Case No.: 2:17-cv-01502<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT FOR**<br>**VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934** |

Plaintiff, Frances Moran ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

**INTRODUCTION**

1.      Plaintiff brings this action on behalf of herself and the public stockholders of VCA Inc. ("VCA" or the "Company") against VCA and the members of VCA's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of VCA to Mars Incorporated ("Mars").

2.      On January 9, 2017, Mars announced a definitive agreement (the "Merger Agreement") to acquire all outstanding shares of VCA in a transaction valued at approximately $9.1 billion. Under the terms outlined in the Merger Agreement, Mars, through its wholly-owned subsidiary, MMI Holdings, Inc. ("Acquiror"), acquire all of the outstanding shares of VCA, with each share of VCA common stock being cancelled and converted into the right to receive $93 per share in cash (the "Proposed Transaction").

3.      In connection with the Proposed Transaction, defendants filed a materially incomplete and misleading proxy statement with the Securities and Exchange Commission ("SEC") on February 15, 2017 (the "Proxy"). According to the Proxy, the stockholder vote on the Proposed Transaction will take place on March 28, 2017.

CLASS ACTION COMPLAINT

4.     Specifically, the Proxy contains materially incomplete and misleading information concerning the financial projections for VCA, which were relied upon by the Board in assessing the fairness of the Proposed Transaction and by the Company's financial advisor, Barclays Capital, Inc. ("Barclays"), in connection with preparing its fairness opinion. Consequently, VCA's stockholders are being asked to vote in support of the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.     VCA and the Individual Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Proxy to be filed with the SEC.  For this reason, and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction unless and until the material information discussed below is disclosed or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' breach of their fiduciary duties and violations of federal securities laws.   Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question

jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) VCA has offices in Los Angeles, California; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

9.     Plaintiff is a citizen and resident of Prescott, Arizona, and has been at all relevant times, the owner of shares of VCA common stock.

10.     Defendant VCA is a leading national animal healthcare company operating in the United States and Canada that is organized and existing under the

laws of the State of Delaware. The Company maintains its principal executive offices at 12401 West Olympic Boulevard, Los Angeles, California. VCA's common stock is traded on the Nasdaq under the ticker symbol "WOOF."

11.     Defendant Robert L. Antin ("Antin"), is one of the Company's founders, and has served as VCA's Chief Executive Officer, President, and Chairman since the Company's inception in 1986.

12.     Defendant John M. Baumer ("Baumer") has served as a director of VCA since September 2010.

13.     Defendant John B. Chickering Jr. ("Chickering") has served as a director of VCA since April 2004, as well as previously serving as a director of VCA from 1988 to 2000.

14.     Defendant John Heil ("Heil") has served as a director of the Company since February 2002. Heil previously served as a director of VCA from 1995 to 2000.

15.     Defendant Frank Reddick ("Reddick") has served as a director of VCA since February 2002.

16.     Defendants Antin, Baumer, Chickering, Heil, and Reddick, are collectively referred to as "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action individually and as a class action on behalf of all holders of VCA stock who are being, and will be, harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

18.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

19.     The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of January 17, 2017, VCA had 81,573,526 shares of Company Common Stock (including 341,138 shares of Company Restricted Stock) issued and outstanding.  These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

20.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, inter alia, the following:

a.      whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Transaction; and

6

CLASS ACTION COMPLAINT

b.      whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

21.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

22.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

23.    The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

24.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

25.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

26. Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

**COMPANY BACKGROUND**

27. VCA, a leading national animal healthcare company operating in the United States and Canada, provides veterinary services and diagnostic testing to support veterinary care. Additionally the Company sells diagnostic imaging equipment and other medical technology products and related services to the veterinary market. Headquartered in Los Angeles, California, VCA has enjoyed continued success in the animal healthcare market.

28. VCA's continued success is best exhibited by the fact that the company has enjoyed nine consecutive quarters of double digit growth in revenue. Despite these results, and the fact that VCA is well-positioned to enjoy a bright financial outlook and generate significant earnings in the foreseeable future, the Board has agreed to a merger with Mars Incorporated, a leader in the food industry, that will permit Mars to gain a dominant position in the rapidly growing pet care industry.

29. In light of VCA's recent and historical financial performance and strong growth prospects, it is vital that VCA's stockholders receive all material

information concerning the Proposed Transaction, so that they may make an informed vote on the Proposed Transaction and/or seek appraisal for their stock.

**THE MERGER ANNOUNCEMENT**

30.   In a press release dated January 9, 2017, VCA announced that it had entered into the Merger Agreement on January 7, 2017 with Mars pursuant to which Mars will acquire all outstanding shares of VCA in a transaction valued at approximately $9.1 billion.  As a result of the Merger, VCA will become a wholly-owned subsidiary of Mars.

31. The press release states in pertinent part:

MCLEAN, Va. and LOS ANGELES, Jan. 9, 2017 – Mars, Incorporated and VCA Inc. (NASDAQ:WOOF) today announced that they have entered an agreement under which Mars will acquire all of the outstanding shares of VCA for $93 per share, or a total value of approximately $9.1 billion including $1.4 billion in outstanding debt. The transaction price represents a premium of approximately 41 percent over VCA's 30-day volume weighted average price on January 6, 2017, and a premium of approximately 31 percent over VCA's closing price on January 6, 2017. The agreement has been unanimously approved by the boards of directors of both companies.

VCA joins Mars Petcare, one of the world's leading pet care providers. Pet care has been an important part of Mars for over 80 years. The transaction reaffirms Mars' commitment to the pet care industry and the veterinary profession, and once completed will help drive Mars Petcare's purpose to create A Better World for Pets. Mars Petcare's portfolio of Veterinary Services businesses includes BANFIELD® Pet Hospital, BLUEPEARL® and PET PARTNERS™. Together with VCA, these businesses will provide an unprecedented level of access to high quality veterinary care for pets, from wellness and prevention to primary, emergency and specialty care. Mars Petcare is already an industry leader in pet nutrition with global brands that include ROYAL

**CLASS ACTION COMPLAINT**

CANIN®, PEDIGREE® and WHISKAS®. Mars has a growing business in pet DNA testing through the WISDOM PANEL®, and in 2015 also acquired pet technology provider WHISTLE.

"We are thrilled to welcome VCA to the Mars family and to our portfolio of brands and businesses around the world," said Mars Chief Executive Officer Grant F. Reid. "VCA is a leader across pet health care and the opportunity we see together—for pets, pet owners, veterinarians and other pet care providers —is tremendous. We have great respect for VCA, with whom we share many common values and a strong commitment to pet care. Together, we will be able to provide even greater value, better service and higher quality care to pets and pet owners."

Since its founding in 1986, VCA has grown from one facility in Los Angeles to nearly 800 animal hospitals with 60 diagnostic laboratories throughout the United States and Canada. Through organic growth and a series of acquisitions, VCA has become one of the largest and most diverse pet healthcare companies, operating across four divisions including veterinary services, laboratory diagnostics, imaging equipment and medical technology, and pet care services.

"Joining the Mars family of brands provides significant value to our stockholders while also preserving the Company's values and a culture focused on investing in our people and facilities to promote excellence in pet care and long-term growth," said VCA Chief Executive Officer Bob Antin. "Mars has a long-standing commitment to pet health, wellness and nutrition. We will work together every day to continue to provide the quality care and excellent service VCA is known for to our clients and their pet families."

"We have always been impressed by VCA and the excellent services it offers to pets across diverse business segments," said Mars Global Petcare President Poul Weihrauch. "VCA's industry-leading partnerships with veterinarians and pet care providers together with its expertise in veterinary services, diagnostics and technology will position Mars to deliver accessible, quality care and continue to create a better world for pets. VCA's philosophy of partnering with the veterinary profession and educational institutions is aligned with our

CLASS ACTION COMPLAINT

core values and culture. We look forward to together providing the best care possible for pets."

As one of the world's leading pet care providers, Mars Petcare is committed to attracting, developing and retaining the best veterinarians and pet care professionals in the world, supporting them in their efforts to provide cutting edge delivery of healthcare to pets and to advancing the profession.

32.     As noted in both the press release and Merger Agreement, VCA stockholders will have the right to receive, in exchange for each share of VCA common stock, $93.00 in cash.

33.     The vote on the Proposed Transaction is scheduled for March 28, 2017, at 10:00 a.m. Pacific Time, at VCA's corporate offices located at 12401 W. Olympic Boulevard, Los Angeles, California 90064-1022.

**THE MERGER PROCESS**

34.     The story of this merger begins over two years ago. During the summer 2014, Mars approached VCA regarding the possibility of a strategic transaction. In response to Mars' demonstrated interest in acquiring the Company, the Board undertook a review of the Company's strategic business plan, sought the advice of a financial advisor and held meetings with senior management to consider Mars' proposal. After a careful review, the Board ultimately came to the conclusion that VCA's prospects for growth and execution of its business plan were strong, and that acquisition was not in the best interest of the company. Although no deal was

reached at that time, VCA's management team has maintained regular contact with Mars in the intervening period.

35.    In October 2016, over two years later, representatives of a private equity firm (the "Private Equity Firm") contacted Antin, VCA's Chief Executive Officer, President, and Chairman, regarding the potential acquisition of VCA. As a result, VCA's Board directed management to enter into a confidentiality agreement with the private equity firm and permit the firm to access a limited amount of non-public information.  The confidentiality agreement contained a standstill provision that prevented the private equity firm from acquiring the Company's common stock or participating in a proxy solicitation regarding the Company's common stock without VCA's consent.

36.    Shortly thereafter, on November 11, 2016, the Chief Executive of Mars, Grant F. Reid ("Reid"), called and left a voicemail for Antin. Antin returned Reid's call the following day, and the two agreed to have dinner with one another in Los Angeles, California on November 14, 2016.

37.    The November 14, 2016, dinner was attended by Antin, Reid, and Claus Aagaard ("Aagaard"), the Chief Financial Officer of Mars. At the dinner, Reid and Aagaard proceeded to outline a potential transaction wherein Mars would acquire all of the capital stock of VCA at a price of $90 per share in cash. Reid and Aagaard specified that, following the acquisition, VCA would continue to operate as

CLASS ACTION COMPLAINT

a separate business headquartered in Los Angeles and that the Company's existing leadership team would remain intact. Discussions between the three executives continued the following morning.

38.   At various points in time from November 14 through November 16, 2016, Antin notified each member of the Board to inform them of his discussions with Mars.

39.   On November 18, 2016, Mars delivered an indication of interest to acquire the Company at a price of $90.00 per share.  The indication of interest contemplated that, following the merger, VCA would continue to operate as a separate business and brand within Mars' petcare business and that VCA would continue to be managed by its current senior management.

40.   After being informed by VCA's management of the competing offer, the Private Equity Firm indicated its unwillingness to pursue a transaction at the price included in the Mars proposal, and suspended its interest in a potential acquisition.

41.   With only one proposal left to consider, the Board held a telephonic meeting on November 21, 2016 to study Mars' offer.  The Board determined to continue the negotiations with Mars, but mandated that any discussions regarding a potential transaction should be kept confidential. The Board authorized Antin to acknowledge the Board's receipt of the indication of interest, but directed Antin not

CLASS ACTION COMPLAINT

to have any discussions with Mars on price or terms of any potential transaction, or to have any discussion as to Mr. Antin's future employment, except after consultation and direction of the Board.

42.     Included as part of these discussions on November 21, 2016, was the Board's decision to engage the services of Barclays as a financial advisor, and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as legal counsel.

43.     On November 29, 2016, the Company and Mars entered into a confidentiality agreement containing a standstill provision in order to facilitate due diligence.   This standstill provision prohibited Mars and its representatives from acquiring Company common stock or participating in a proxy solicitation regarding VCA's common stock without VCA's consent.   Later that day, Antin met with Reid and Aagaard to further discuss the Board's concern that the discussions between the two companies be kept strictly confidential.

44.     Representatives of the two companies engaged in high-level discussions regarding key terms of a merger "[b]etween December 1 and December 7, 2016." Specifically, Barclays had numerous discussions with Mars' financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley") and BDT & Co. ("BDT"), to learn more about the financing structure for the transaction and the areas and depth of diligence required by Mars, and Akin Gump had numerous conversations with legal counsel to Mars' legal counsel, Skadden, Arps, Slate,

CLASS ACTION COMPLAINT

Meagher & Flom LLP ("Skadden"), regarding the due diligence process envisioned by Skadden and Mars.

45.     The Board met again on December 8, 2016, to consider Mars' proposal and potential alternatives. The Board determined to continue discussions with Mars, with the express direction of maintaining confidentiality, but requested that Barclays contact Mars' representatives in order to broach the subject of increasing the proposal above $90 per share.

46.     Included as part of the deliberations on December 8, 2016, were discussions as to whether to solicit other indications of interest from other potentially interested parties. The Board ultimately determined not to contact any additional parties regarding a potential strategic transaction, stating that "(a) the size of the premium offered by Mars and the Board's belief, based on its familiarity with the industry and after consideration of the materials provided by Barclays, that other potentially interested parties would not likely be prepared to pay more than the price that Mars would be prepared to offer, (b) [the Private Equity Firm's] suspension of its due diligence examination and indication that it would not be interested in pursuing a transaction at the price included in the Mars proposal, (c) concern that, given the lack of other potentially interested parties prepared to pay more than what Mars would be prepared to offer, soliciting other indications of interest would increase the risk of public disclosure and potentially cause material harm to the

CLASS ACTION COMPLAINT

Company and its business, (d) the risk that soliciting additional indications of interest could delay discussions with Mars and potentially risk losing the opportunity of effecting a transaction with Mars and (e) the fact that the other potentially interested parties would be able to submit a competing proposal, if they so desired, following the announcement of the execution of any merger agreement." In order to guarantee that other companies would be able to submit competing offers following the merger announcement, it was the "consensus of the Board that the Company should request that any merger agreement include a 'go-shop' provision, which would permit the Company to solicit competing proposals for a period of time following signing."

47.  On December 9, 2016, Skadden distributed an initial draft merger agreement to Akin Gump.

48.  On December 15, 2016, the Board held a special meeting to discuss the initial draft merger agreement. The board discussed a number of key terms and conditions of the draft of the merger agreement, including financing, treatment of outstanding Company equity awards, closing conditions, termination provisions, deal protection provisions, specific performance, the lack of a "go-shop" provision, and the Company's affirmative and negative covenants.

49.  On December 21, 2016, VCA delivered to Mars a revised draft of the merger agreement that reflected the Board's desires pertaining to: (i) a "go-shop"

CLASS ACTION COMPLAINT

provision that would permit the Company to solicit competing proposals for a period of time following signing, (ii) a "hell or high water" provision requiring Mars to take all actions necessary to obtain antitrust approval; and (iii) a modified termination fee structure and other deal protection terms more favorable to the VCA.

50.　The two companies and their representatives engaged in high-level conversations regarding several key terms from December 22 through December 26, and on December 27, 2016, Mars delivered a revised draft of the merger agreement. The revised draft increased the price per share to $93.00, included a termination fee of 3.75% structured closely along the lines proposed in the initial Mars draft of the merger agreement, provided deal protection provisions more in line with the initial Mars draft of the merger agreement, and removed both the "go-shop" provision and "hell or high water" provision.

51.　On the same day that the Mars delivered a revised draft of the merger agreement, the Board held a special meeting to discuss Mars' revised proposal. During the meeting, Antin led a discussion regarding management's view of VCA's prospects as a stand-alone company as well as the feasibility of the potential strategic alternatives. The Board concluded that neither continuing to operate as a standalone corporation nor any of these potential strategic alternatives was

CLASS ACTION COMPLAINT

reasonably likely to create greater value for the Company's stockholders than Mars' revised proposal.

52.    The Board met again on December, 29, 2016, to further discuss the revised draft of the merger agreement that was delivered on December 27, 2016. Based on a review of the revised draft, the Board concluded that Mars was unwilling to include a "go-shop" provision or agree to the Board's request for a "hell or high water" provision.

53.    From December 31, 2016, to January 7, 2017, the parties continued negotiation of various terms of the merger agreement, including the termination fee and the inclusion of the "hell or high water" provisions, and exchanged several revised drafts of the merger agreement.  None of these revised drafts included a "go-shop" provision.

54.    The final proposed draft, submitted on or about January 7, 2017, included a "hell or high water" provision, a termination fee of $275 million, and contemplated a price per share of $93. The final proposed draft did not include a "go-shop" provision.

55.    During a special Board meeting on January 7, 2017, the Board reviewed the proposed final draft of the merger agreement as well as the fairness opinions prepared and provided by Barclays.  The Board unanimously approved the merger, and the Merger Agreement was executed later that day.

18

CLASS ACTION COMPLAINT

56.    On January 9, 2017, the two companies announced the execution of the Merger Agreement.

**THE PROXY IS MATERIALLY MISLEADING**

57.    Defendants caused the Proxy to be filed with the SEC, and the Proxy has been published on the SEC's online EDGAR database. The information contained in the Proxy has been disseminated to VCA stockholders to solicit their vote in favor of the Proposed Transaction.

58.    As discussed below, the following material information concerning the financial projections prepared by VCA's management and used in the financial analyses of the Proposed Transaction performed by VCA's advisor, Barclays, is omitted. This omitted information renders statements made in the Proxy materially misleading, as the below-referenced omitted information, if disclosed, would significantly alter the total mix of information available to VCA's stockholders.

59.    The Proxy Statement fails to disclose material information concerning the Company's financial projections.  Specifically, the Proxy Statement discloses four non-GAAP accounting metrics for projected financial information over the years 2017-2021:  Adjusted EBITDA, Adjusted Net Income, Adjusted Fully Diluted EPS and Unlevered Free Cash Flow.  Although the Proxy describes the various adjustments that were made to these non-GAAP measures, it fails to disclose the line item projections for the adjustments. Providing these non-GAAP metrics

**CLASS ACTION COMPLAINT**

without disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading.  Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance. Rather than disclose the information necessary to reconcile these measures, Defendants chose to omit this information.

60.    Consequently, the Proxy Statement provides VCA stockholders with a number of non-GAAP financial projections that make it extremely difficult for stockholders to assess the fairness of the Proposed Transaction. This is particularly problematic for VCA stockholders. Because of the non-standardized and potentially manipulative nature of non-GAAP measures, the SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses material information in a proxy that includes non-GAAP financial measures, the Company must also disclose that non-GAAP financial measure along with comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

61.    Item 10(e)(1)(i)(B) of SEC Regulation S-K further states that, with regard to forward-looking information such as financial projections, *any* reconciling metrics that are available without unreasonable efforts must be disclosed.  17 C.F.R.

CLASS ACTION COMPLAINT

229.10(e)(1)(i)(B).  Moreover, on May 17, 2016, the SEC's Division of Corporation Finance released updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures. One of these, SEC CD&I 102.07 specifically states with regard to "free cash flow" that "a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used."  *See* S.E.C. Comp. & Disc. Interps., Question 102.07 (May 17, 2016) https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.   Nevertheless, the Proxy makes no effort to account for the failure to reconcile the non-GAAP measures to GAAP metrics.

62.    Moreover, the Proxy states at page 30 that the Company entered into a confidentiality agreement with the Private Equity Firm to allow confidential due diligence to take place.  Specifically, the Proxy states that this "confidentiality agreement contained customary standstill provisions which, among other things, prevented [the Private Equity Firm] and its representatives from acquiring the Company's common stock or participating in a proxy solicitation regarding the Company's common stock without the Company's consent."

63.    This statement is materially misleading because it fails to disclose whether this provision is currently operating to contractually preclude the Private Equity Firm from making a topping bid to acquire the Company, and fails to

disclose whether the "customary" provisions included "don't-ask-don't-waive" provisions that are currently serving to forbid the Private Equity Firm from seeking a waiver of the standstill terms.   Without this information, the Company's stockholders are being misled into assuming that the Private Equity Firm, which was actively interested in acquiring the Company, could make an offer to acquire the Company if it so chose – when it is likely that it is actually precluded from doing so.

64.    The likelihood of the Private Equity Firm being currently precluded by a "don't-ask-don't-waive" standstill from making a topping bid for the Company is corroborated by Section 6.3(a) of the Merger Agreement, which forbids VCA from waiving any standstill agreements, unless the VCA Board were to find that it would be a breach of fiduciary duty for it to fail to waive it.  Such a provision would serve no purpose unless VCA had entered into a standstill agreement with a counterparty that served to preclude it from making a topping bid for the Company.

65.    Accordingly, based on the foregoing disclosure deficiencies in the Proxy, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will suffer, absent judicial intervention, if VCA stockholders are required to vote on the Proposed Transaction without the above-referenced material misstatements and omissions being remedied.

CLASS ACTION COMPLAINT

# CLAIMS FOR RELIEF

## COUNT I
**Violations of Section 14(a) of the Securities Exchange Act of 1934
and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9)
(Against All Defendants)**

66.     Plaintiff repeats all previous allegations as if set forth in full herein.

67.     The Proxy Statement violates Section 14(a) of the Exchange Act and SEC Rule 14a-9 because it omits material facts, including those set forth above, which render the Proxy Statement false and/or misleading.

68.     Section 14(a) and Rule 14a-9 promulgated thereunder require full and complete disclosure in connection with Proxy Statements. Rule 14a-9 provides that communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

69.     As more fully described above, VCA and the Individual Defendants made materially misleading statements, and omitted to disclose necessary material facts, in the Proxy Statement that it filed in connection with its merger with Mars. Specifically, the Proxy omits material facts concerning the financial projections for VCA that were relied upon by the Board in assessing the fairness of the merger and by Barclays in connection with the preparation of their fairness opinion.

70.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants undoubtedly had access to and/or reviewed the omitted material information and were aware of their duty to disclose this information in the Proxy Statement. Despite these issues, the Individual Defendants disseminated the materially misleading Proxy Statement, which contained statements that, in violation of Section 14(a) and Rule 14a-9, and in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially misleading statements, as the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. VCA is liable as the issuer of these statements.

71.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the stockholder vote on the proposed Merger Agreement. The Proxy Statement is the primary vehicle by which Plaintiff and the Company's stockholders can evaluate the Proposed Transaction. The omissions and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them

CLASS ACTION COMPLAINT

important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

72.   By reason of the foregoing, VCA violated and, unless enjoined, will again violate Section 14(a) and Rule 14a-9 thereunder. Because of the materially misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm.

## COUNT II
**Violations of Section § 20(a) of the Securities Exchange Act of 1934**
**(Against the Individual Defendants)**

73.   Plaintiff repeats all previous allegations as if set forth in full herein.

74.   The Individual Defendants acted as controlling persons of VCA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of VCA and participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading statements contained in the Proxy Statement that was filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of VCA, including the content and dissemination of the various statements that Plaintiff contends are materially misleading.

CLASS ACTION COMPLAINT

75.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected. Additionally, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.

76.     In fact, the Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Furthermore, as set forth in the Proxy Statement, and as described briefly herein, the Individual Defendants were intimately involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

77.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act. The Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By

CLASS ACTION COMPLAINT

virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     Declaring this action to be a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

(B)     Declaring that the Proxy Statement is materially false or misleading;

(C)     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with the shareholder vote on the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

(D)     In the event that the Proposed Transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     Directing Defendants disclose the material information identified above which has been omitted from the Proxy;

(F)     Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by their wrongdoing;

(G)     Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(H)     Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

CLASS ACTION COMPLAINT

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 23, 2017                    **LEVI & KORSINSKY LLP**


By: _/s/ Rosemary M. Rivas_
Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, CA 94111
Tel: (415) 291-2420
Fax: (415) 484-1294

Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567
Email: denright@zlk.com

*Counsel for Plaintiff Frances Moran and the Proposed Class*

CLASS ACTION COMPLAINT